[S. F. No. 1704.    Department Two. — March 4, 1901.]

## CHARLES R. LLOYD, Appellant, v. PETER KEHL et al., Respondents.

FRAUD — SALE OF WATER RIGHTS — EXPRESSION OF OPINION — NONSUIT. — In an action founded upon fraud, consisting of false representations of the defendant, made upon a sale of water rights to the plaintiff, where it appeared that there was no misrepresentation as to the quantity of water, and the only proof given was as to what was claimed to be a misrepresentation of the amount of horsepower which could be developed in the future, by means of a proposed flume to increase the power, and by the construction of a new water-wheel, such representation must be deemed the expression of mere matter of opinion, which is not actionable, and a nonsuit was properly granted.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial.    J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

W. S. Goodfellow, and Myrick & Deering, for Appellant.

Page, McCutchen, Harding & Knight, for Respondents.

McFARLAND, J. — This action was brought to recover judgment for the cancellation of certain promissory notes made by plaintiff to defendant Kehl, and for the delivery by said defendant to plaintiff of certain shares of stock given to secure said notes, and for damages for certain alleged wrongs.    The action is founded on alleged false representations made to plaintiff by defendant Kehl as to certain water rights sold to the latter by the former, the sale being the consideration of the notes.    The answer denies the material averments of the complaint; and in a cross-complaint Kehl prays judgment against plaintiff for the amount due on the notes.    The court below granted a nonsuit, and instructed the jury to find a verdict for defendant for the amount of the notes, and judgment was entered accordingly.    Plaintiff appeals from the judgment and from an order of the court denying a new trial.    The above rulings were upon the ground that the misrepresentations relied on were of mere matters of opinion, and not of facts, —

were mere speculations as to what might be developed in the future, as to which the means of knowledge were open to the plaintiff. If the court was right in these views, the nonsuit and the instruction to find for the defendant were both correct; and the question thus presented is the only one discussed by counsel, and the only one that need be considered. ·

The main features of the case are these: On and long prior to September 2, 1892, respondent Kehl was and had been the owner of the right to the use of the water of a natural stream called Warm Creek, which he had used through a ditch to operate a flour-mill. On that day Kehl entered into a written agreement with the plaintiff, Lloyd, and one Cartwright, in which it was recited that the parties were desirous of incorporating an electric company for the purpose of furnishing electricity to the city of San Bernardino, and that Lloyd and Cartwright were desirous of purchasing the said water rights (together with certain other property) for the purposes of the said electric company; and it was covenanted that Kehl should sell to Lloyd and Cartwright all of the water rights for twenty thousand dollars,—five thousand dollars to be taken in stock of said company, and three payments of five thousand dollars each, to be made in one, two, and three years. It is averred in the complaint that at the time this contract was made Kehl represented that power could be furnished by said water to the extent of sixty-five effective horse-power; that after the electric-works had been partly constructed, it was discovered that said representation was false, and that not more than forty-five horse-power could be supplied; that plaintiff then refused to pay any part of said fifteen thousand dollars to be paid in money, and Kehl brought suit to recover the first payment; that a compromise was then effected, and a new contract was made on March 3, 1894, between Kehl, party of the first part, Lloyd, party of the second part, and the electric company, which had been incorporated as contemplated, as party of the third part,—Cartwright having dropped out of the business. By this contract the former contract of September 2, 1892, was modified in several particulars, the most important one being that Kehl should take his pay for the water rights in a certain amount of the stock of the electric company, and a certain note or bond of a corporation called the Riverside Water Company. It is averred that the plaintiff was induced to enter into this contract by a false representation of

Kehl that there was a certain amount of water in said stream. It was also averred that afterwards, on April 18, 1895, another contract was made between Kehl and appellant by which Kehl surrendered his stock in the electric company, and appellant gave him, instead thereof, his four promissory notes, which are the subjects of this action. It is averred in the complaint that plaintiff was induced to make each of these contracts by false representations of respondent Kehl as to the water rights; so that between September 2, 1892, and April 19, 1895, appellant, according to his claim, was decoyed three times into purchasing rights by false representations concerning them made by respondent Kehl.

There is no evidence, and no contention by appellant, that Kehl made any false representations as to the amount of water flowing in Warm Creek. In his opening brief appellant says: "There was no evidence to sustain the allegations of the complaint that defendant had represented the quantity of water in Warm Creek to be twenty-five hundred miner's inches, or any other measured quantity. The representations proven were as to the amount of horse-power."

The representations relied on can be fairly presented by a few quotations from the testimony of appellant's three main witnesses, — Porter, Cartwright, and appellant himself. Before the making of the first contract of September 2, 1892, Porter went from San Bernardino to San Francisco at the instance, as he says, of Kehl, and made to Lloyd and Cartwright the representations which he says Kehl had made to him. These representations were, in the language of Porter, as follows: "Mr. Kehl told me that there was a 45 horse-power there developed, and by deepening the tail-race and the wheel-pit there would be 65 horse-power; and by building a flume and taking up all the horse-power there was there, there would be 180 or 185 horse-power. . . . These representations which Mr. Kehl made to me, I made to Mr. Lloyd." Having stated that Lloyd and Cartwright agreed to go down and talk with Mr. Kehl about the matter, he says as follows: "These gentlemen did go to San Bernardino and see Mr. Kehl. I think it was in the month of August, 1892. I was present in the conversations between Mr. Kehl and Mr. Lloyd in regard to this horse-power, a number of times. My recollection is that Mr. Kehl made the same representations in regard to the water-power to Mr. Lloyd that were made to me, — that they

were reiterated in the conversations between himself and Mr. Lloyd." The witness further testified,—referring to Lloyd's visit to San Bernardino in August, 1892,—"I know that Mr. Lloyd saw the property down there,—the mill, the water, and the dam." Cartwright testified as to the representations about the water-power, as follows: "Mr. Porter represented that this power was capable of being developed to something like 175 horse-power; that, as it stood at that time, it developed some 45 horse-power, and could be increased to 65 horse-power by some changes which he specified, and which I recollect were gone into before in the testimony given here." He also said: "I do not think the amount of water was discussed at any time. The whole proposition turned on the horse-power. I was not familiar with measuring water at all, and I don't remember that it was talked of." The following extracts from the testimony of the appellant, Lloyd, fairly show what his testimony was as to the misrepresentations: "Mr. Porter did make representations to me as to the quantity of water-power that was there, and as to the quantity of horse-power that could be developed by the water that was there. He told me that there was, at that time, forty-five horse-power, and that we could probably make that out to run the city lights, which would be about sixty lights, in case that we got the contract; and that if it was not enough, by digging a tail-race and lowering the turbine wheel, which Mr. Kehl had, we could get sixty-five horse-power. I asked him if Mr. Kehl had told him so, and he said, "Yes."" The witness also said: "Mr. Porter also said that if we wanted to increase the business by building a flume, at an expense, I think, of about eight thousand or ten thousand dollars, 180 or 185 horse-power could be developed,—anyway, from 175 to 185 horse-power. Mr. Kehl corroborated the statements of Mr. Porter. He said that there was a forty-five horse-power running there at that time. It was the same forty-five horse-power that I had myself used about twelve years ago. That by deepening the tail-race and lowering the wheel-pit, it could be made into a sixty-five horse-power. It was part of the whole scheme to build this flume to increase the elevation of the water by building this flume to increase the fall of it, and to save the amount of water that went into the ground by seepage and evaporation. We were to build a cement ditch and a flume at a cost of probably ten thousand dollars. Mr. Kehl then said that the building of

this ditch and flume would develop 175 horse-power." He also said: "My chief cause of complaint against Mr. Kehl is, that he misrepresented the amount of power that could be developed by that flume and the new wheel." Again he says: "In these conversations had between Mr. Porter, Cartwright, Mr. Kehl, and myself, it was represented by Mr. Kehl that 175 horse-power could be developed from the stream as it then stood, by means of the flume and the new water-wheel." He then testified that with the new flume, the new wheel, and other new appliances, not more than from ninety to one hundred horse-power was developed.

There is a great deal of other testimony relied on by respondent, to the effect that appellant had leased all of Kehl's water rights in the creek several years before the contract was made, and knew their character and extent; that he was perfectly familiar with the property before he entered into the first contract of 1892; and that before the making of the last contract of 1895 he had been informed by his agent at San Bernardino that the amount of horse-power represented by Kehl could not be developed. There was also other evidence in the case, upon which the respondent makes other points, which we do not deem necessary to consider. The questions arising out of the distinction between representations of matters of opinion and representations of matters of fact have been very fully and learnedly argued by counsel on both sides. There is not much difficulty as to the general principles of law which govern these questions; and instead of entering into a discussion as to these principles, we have thought it best to simply state the representations which were made in the case at bar, and to determine whether or not they are sufficient to sustain this action; and we are of the opinion that these representations are of mere matters of opinion, upon which appellant should not have relied, and that they do not sustain his present action. It is clear that there was no misrepresentation as to the amount of water running in the stream. The situation was simply this: Kehl, by means of a certain ditch, had been for years diverting to his mill the water of a certain stream with which both parties were familiar; and he said to appellant, that, by building a new flume and ditch, and using a new wheel and certain other new appliances, and thus increasing the fall, etc., there could be developed from the water in the stream—*about the quantity of which there was no misrepresenta-*

*tion or misunderstanding* — a certain amount of horse-power. This was a mere speculative opinion, not actionable under the most extreme authorities to be found on this subject. Appellant introduced the expert witnesses, Cartwright and Bowie, who testified, that, the quantity of water in the stream and its fall being given, the number of horse-power which it will furnish can be calculated, and that going backward, the horse-power being given, the amount of water in the stream can be calculated; and upon this statement appellant seeks to base the colorable theory that when Kehl mentioned the horse-power that could be developed, he must be held to have stated with certainty the amount of water in the stream, and that the amount of water shown by such calculation was largely in excess of the actual water in the stream; *ergo,* he misrepresented the amount of water. Now, in the first place, the calculation of the experts was only of the theoretical horse-power, — not the efficient horse-power; the ": efficient" horse-power was what Kehl was speaking of, — and to quote, for brevity, from respondent's brief, "the effective horse-power depends upon the friction of the flume, or of the pipe, its grade, the loss by seepage or evaporation, the efficiency of the waterwheel, the way in which it is placed, the character of the discharge, and, as Mr. Cartwright himself said, 'a hundred and one other different things.'" In the second place, if this was a matter of pure mathematics, appellant should have relied on his own calculations, and not upon those of Kehl; there is no evidence that the latter pretended to be an hydraulic expert. And lastly, there never was any question of the fact of the amount of water in the stream, nor any pretense that appellant was deceived as to *that fact* by any misrepresentation of Kehl. Under the evidence the nonsuit was properly granted.

The above views cover substantially, we think, all the positions taken by appellant which need consideration.

The judgment and order appealed from are affirmed.

Temple, J., and Henshaw, J., concurred.

Hearing in Bank denied.