[Civ. No. 740.   Third Appellate District.—August 8, 1910.]

## C. H. W. BRANDT, Appellant, v. J. C. KROGH, Respondent, and L. J. ABRAMS, Codefendant.

ACTION ON NOTE—CROSS-COMPLAINT—CANCELLATION FOR FRAUD—SUR-RENDER OF OIL STOCK—SUPPORT OF FINDINGS.—In an action on one of two notes executed in consideration of a transfer of stock in an oil company, of which the comaker was manager, in which the other maker defended the note and sought by cross-complaint to cancel the notes for fraud and misrepresentation in the procurement of the notes to the payee for a transfer of worthless stock from him, by agency of the manager whose false and fraudulent representations procured the notes, it is held that the findings that both notes were procured by the alleged fraud and misrepresentation were sufficiently sustained by the evidence, and that an attack upon its insufficiency is wholly devoid of merit.

Id.—Inconsistencies in Testimony of Defendant Defrauded—Rule as to Discredit not Imperative.—The rule embodied in the maxim, *"Falsus in uno, falsus in omnibus,"* as applied to inconsistencies in the testimony of the defendant claiming to have been defrauded, is not imperative, and does not mean that the entire testimony of the witness must necessarily be disregarded or disbelieved, because there may be found falsehood in certain parts of his testimony, but it merely means that when the witness has sworn falsely in part, his entire testimony *may* for that reason be disregarded. But a jury or trial judge trying a case has the right to believe and credit certain parts of the testimony of the witness, who has sworn falsely as to certain other material parts thereof.

Id.—Presumption as to Action of Judge—Determination Conclusive upon Appeal.—It is to be presumed that the trial judge in the case at bar reconciled and accounted for to his own satisfaction any and all inconsistencies which might be made to appear in the testimony of the comaker defrauded, and from aught that appears in the record to the contrary, it may be that what seems to be contradictory statements in his testimony were not the result of a desire to make a false statement, but were due to a mistake or to a treacherous memory. But whatever may be the ground of the determination by the trial judge, his findings, so far as based upon the testimony of such witness, are conclusive upon this court.

Id.—General Rule as to Fraud Based on Opinion—Qualified Rule—Opinion Based on Facts.—As a general rule, fraudulent representations cannot be predicated upon a mere expression of opinion, however erroneous such opinion may be; but this rule is subject to the qualification that an opinion based upon alleged facts known by the party stating them to be nonexistent will not be permitted to escape responsibility by the plea that he was merely declaring his opinion.

Id.—Rule as to Executed Contracts—Opportunity to Investigate Fraud—Diligence Required.—Where one undertakes to secure, on the ground of misrepresentations and fraud, restoration of the consideration which supported an executed contract, he cannot prevail, if it be made to appear that he could, by the exercise of ordinary prudence or diligence, have detected the fraud, or have ascertained facts which would have disclosed that the representations were false and fraudulent.

Id.—Absence of Means Accessible to Opposer of Note in Equity—Right to Believe Representations as to Unknown Facts.—Where it cannot be said that the defendant, seeking to be relieved in equity against the enforcement of a promissory note, had any accessible means of ascertaining whether the representations made by the manager of the oil company were false or true, owing to the situation of its lands and business in other counties, and to his having no experience in the oil business, such defendant had the right

to rely upon the representations of the manager of the oil company, who had been engaged in the oil business for many years, as to facts which were not, and could not be, expected to be within such defendant's own knowledge.

ID.—DISTINCT RULE AS TO DEFENSE IN EQUITY TO EXECUTORY CONTRACT —DILIGENCE NOT REQUIRED.—Where the plaintiff seeks to recover upon a promissory note as an executory contract, and the defendant appeals to the equity side of the court and declares that the plaintiff should not be permitted to enforce the contract because, as he charged, the same was procured by fraudulent representations, the rule as to executed contracts is inapplicable. A court of equity is a court of conscience, and will under no circumstances enforce or permit to be enforced the terms of a contract founded in fraud, even if there existed and were accessible to the defendant the means and opportunity to detect such fraud by the exercise of. ordinary prudence.

ID.—COUNTERCLAIM—SUPPORT OF FINDINGS.—It is held that a finding in favor of the defendant against the plaintiff upon a counterclaim pleaded by defendant, in the sum of $5,000, is amply supported by the evidence.

ID.—TESTIMONY OF WIFE OF DEFRAUDED PARTY—DECLARATIONS OF MANAGER OF CORPORATION—AGENCY FOR PLAINTIFF.—The testimony of the wife of the defrauded defendant as to a conversation heard between the manager of the corporation and her husband would be admissible only upon the ground that his declarations made in her presence were made by him as agent for the plaintiff, whose oil stock was purchased by her husband upon false representations made by said manager, to induce the purchase of plaintiff's stock.

ID.—DECLARATIONS OF AGENT, WHEN BINDING PRINCIPAL—SCOPE OF EMPLOYMENT AS AGENT.—The declarations of a party can bind no one but himself, unless such declarations are made in his capacity as agent of another party and are within the scope of his powers or authority as such agent. A party dealing with an agent, who is acting within the scope and authority of his employment, is to be considered as dealing with the principal himself. In the case of a contract, if the agent, at the time of making the contract, makes any representation, declaration, or admission, whether true or false, touching the matter of the contract, it is treated as the representation, declaration or admission of the principal himself.

ID.—AGENCY OF MANAGER OF CORPORATION FOR PLAINTIFF AT TIME OF CONVERSATION PROVED.—It is held that from the whole evidence contained in the record the trial court was justified in drawing the inference that the manager of the corporation was acting as agent for the plaintiff, to induce the defrauded defendant to purchase the plaintiff's stock by means of false and fraudulent representations made in his behalf, when the conversation testified to occurred.

ID.—DATE OF CONVERSATION BROUGHT OUT ON CROSS-EXAMINATION—MOTION TO STRIKE OUT.—Where the date of the conversation heard by the defrauded defendant's wife between her husband and the manager of the corporation, who was endeavoring by his statements to induce him to buy the plaintiff's stock, did not appear until the cross-examination of such wife, the objection that authority to sell plaintiff's stock at the time of the testimony was not shown could only be taken by motion to strike out the testimony, which motion was not made.

ID.—HARMLESS RULINGS AS TO EVIDENCE.—The overruling of objections to evidence of statements, which were subsequently substantially proved, and the overruling of objections to evidence of a fact admitted by the pleadings, were harmless.

ID.—ABSENCE OF PREJUDICIAL RULINGS ON EVIDENCE.—*Held,* there were no prejudicial rulings made by the court in the admission or rejection of evidence, conceding that some of them were not strictly correct.

ID.—MOTION FOR NEW TRIAL — NEWLY DISCOVERED EVIDENCE — IMPEACHMENT OF WITNESS—DILIGENCE NOT SHOWN.—A motion for a new trial on the ground of newly discovered evidence tending only to impeach the testimony of an adverse witness was properly denied on that ground, as well as upon the ground that there is not a sufficient showing of diligence in the efforts put forth by the moving party to procure such evidence before the trial.

ID.—SURPRISE—RESULTING INJURY.—A party moving for a new trial on the ground of surprise must not only show "surprise" as used in the statute, but must also show that injury resulted to him from the cause of such surprise; and this can only be done by showing that he could establish an entirely different case favorable to himself in the event that a new trial be granted; and where it appears that he suffered no such resulting injury, the motion for new trial on the ground of surprise was properly denied.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

R. C. Minor, and C. W. Miller, for Appellant.

Cartwright & Cashin, for Respondent.

HART, J.—Brandt brought this action to recover on a promissory note for the sum of $3,750, which was executed in his favor by Krogh and Abrams on the twenty-second day

of October, 1904, at the city of Stockton. Said note called for interest at the rate of seven per cent per annum, and it is alleged that on the twenty-fourth day of January, 1906, the sum of $596.95 was paid on account of said note, leaving a balance due thereon of $3,524.90, for which, with interest from said twenty-fourth day of January, 1906, judgment is asked.

The defendant Abrams failed to answer the complaint, and, therefore, as to him judgment by default was entered.

The defendant Krogh in due time filed an answer in which he made specific denial of the essential averments of the complaint, and, in addition, set up a counterclaim for the sum of $5,000, and, besides, filed a cross-complaint in which he charged that the note declared upon, as well as another note for a like amount executed by him and Abrams at the same time and in favor of plaintiff, were procured by and through misrepresentation and fraud practiced upon him by the defendant Abrams.

The court found in favor of Krogh on the counterclaim, and further found that the charge of fraud and misrepresentation in the procurement of the notes as set forth in the cross-complaint was proved by the evidence.

Krogh was accordingly given judgment for the sum of $5,000 and for the cancellation of the note upon which this action is founded, he having alleged his willingness and readiness and an offer to transfer, deliver and restore to plaintiff the shares of stock, for part payment of which said note was given, and having indorsed and tendered said stock to plaintiff and filed the same in court as a ''continuing tender.''

This appeal is by the plaintiff from the judgment and the order denying his motion for a new trial.

Among the grounds upon which the motion for a new trial was pressed are: 1. ''Surprise during the trial of said action which ordinary prudence could not have guarded against''; 2. ''Newly discovered evidence material to the plaintiff which he could not with reasonable diligence have discovered and produced at the trial.''

The findings are impeached for alleged insufficiency of the evidence to support them, and it is further charged that the

court made a number of erroneous rulings at the trial which
were prejudicial to plaintiff.

1. The findings are sufficiently sustained by the evidence.

The facts as educed from the evidence and found by the
court are substantially these: In the month of July, 1904,
the defendant L. J. Abrams was a stockholder and manager
of a concern known as the "Ashurst Oil Land and Develop-
ment Company," a corporation which was then engaged in
the business of working and developing oil lands, situated
in the county of San Benito. In said month of July, Abrams
became acquainted with Krogh at the latter's residence in
the city of Fresno. On that occasion, Abrams, evidently
with the purpose of selling Krogh certain shares of stock
in said corporation, proceeded to give Krogh a glowing ac-
count of the corporation's oil land holdings and of the flatter-
ing prospects foreshadowed by the alleged existing conditions
on said properties. On the occasion now alluded to Krogh
bought 250 shares of the corporation's stock.

The character of the representations made by Abrams to
Krogh with reference to the corporation's properties may
best be told in the language of Krogh himself, who testified,
in part, as follows: "At that time he got to talking about
the Ashurst Company. How good it was, the number of
wells, the number of acres they had, and stated they owned
900 acres of land, and had 1,500 acres of land on a twenty-
year lease, altogether 2,400 acres the company owned. He
said the company had on hand anywhere from seventy to
seventy-five thousand dollars in the treasury; that they had
three wells, one was down six or seven hundred feet, one
eight or nine hundred feet, one of the wells flowed water and
it was of great value over there because water was scarce;
that one of the wells was down eighteen or nineteen hundred
feet and it flowed oil, but that they intended to go down
2,400 feet and get an extra good well, and that they kept
it capped for the purpose of buying up the surrounding
land before anyone found that oil was there. They kept
the well capped for the purpose of keeping people from dis-
covering they had oil. I was at home when these representa-
tions were made. Mrs. Krogh was also present; Mr. Webb
was there too. I don't think such a great deal was said when
he was there. He didn't stay very long. I saw Mr. Abrams

frequently after that; several times a week, sometimes several times a day. I met him afterward when he came to sell me the 10,000 shares of stock belonging to Mr. Brandt. These statements he made to me were in July, 1904."

The conversation between Abrams and Krogh in the month of July was in the presence and hearing of Mrs. Krogh. In the month of September, 1904, Abrams represented to Krogh that Brandt was the administrator of the estate of his father in law, one Bachman, and that said estate had some 10,000 shares of stock in the corporation which was for sale. "At that time," continued Krogh, "he [Abrams] made representations to me about the condition of the company, and the acreage they owned, and the value of the stock. He stated that they couldn't buy any of the company's stock for $1.50 a share; that they had none for sale; he had sold all they wanted to, and had plenty of money to develop it, and that this was the only stock that could be had. At that time he stated, as he did before, the number of wells that was on it. One of the wells was capped for the purpose of buying up all the surrounding country, and that well flowed oil, but they wanted a better well, so was going down deeper. I should say that I talked with him several hours at that time. He was talking all of that time about the oil business, telling me how good it was, etc. He told me at that time that the company owned 900 acres and 1,500 acres on a twenty-year lease. He said that oil was high-grade 32-gravity oil. He said he had a good flowing well, but that they wanted to make a better well. He spoke of the other wells, said one was a water well and was of great value because water was a scarce article there, the other well he didn't say much about because it was shallow. They did not get oil there and did not get water. I surely did believe the statement of Mr. Abrams. Couldn't do anything else. I did subsequently buy these 10,000 shares of stock. I bought it because Mr. Abrams claimed it was a good thing, going to make me a lot of money, and did not have to be paid for until it was developed and had two or three years to pay for it, and he claimed inside of six months it would be worth $60 a share, because they were going to push the thing right through. He said you can sell enough of the stock to pay Mr. Brandt or keep the whole thing if you feel like you can afford it."

Krogh purchased the 10,000 shares at seventy-five cents per share and gave therefor two promissory notes for $3,750 each, said notes having been indorsed, as security for their payment, by Abrams, who represented to Krogh that Brandt was willing to accept the notes upon condition that Abrams would so indorse them.

Mrs. Krogh's testimony was corroborative of the testimony of her husband as to the representations made by Abrams at the first conversation held at Krogh's residence.

Brandt, testifying in his own behalf, stated on cross-examination that the shares of stock sold by Abrams to Krogh belonged to the directors of the corporation and not to the estate of Bachman, deceased. He further stated that it was agreed among the directors that said 10,000 shares should be sold by Abrams for not less than fifty cents per share, which was the amount which he had paid for said stock, and that the proceeds should be devoted to the extinguishment of a note which he and the other directors had given the San Joaquin Valley Bank for the sum of $5,000, upon which there were credits reducing the amount to $4,500, said amount having thus been procured by the directors for the purpose of liquidating "the indebtedness of the Ashurst Oil Company." In this connection, it may be explained that Brandt himself paid said note at the bank, on an agreement with the other directors that 10,000 shares of stock should be turned over to him and that by the sale of the same he could thus be reimbursed for the sum paid by him to extinguish their obligation at the bank. This agreement was carried out and Brandt thereby secured the stock sold by Abrams to Krogh.

O. B. Parkinson, who was secretary of the corporation from its organization to the 1st of December, 1905, testified that during his said connection with it the corporation had no fee simple title to any land; that all the lands it had ever had possession of and proposed to develop were leased; that he did not think that the corporation at any time had possession of or under lease as much as 1,500 acres of land. He declared that there was no oil found in any of the wells which were sunk by the corporation on its leased lands. He also testified that the corporation "never had as much as $70,000 available at any one time in the San Joaquin Valley Bank." In connection with this witness' testimony the book contain-

ing the corporation's account with the San Joaquin Valley
Bank was introduced in evidence, and from this book it ap-
peared that the largest sum on deposit in said bank in the
name of the corporation from June 23, 1904, to December 28,
1904, was $1,280.60.

J. P. Plaugher testified that he worked for the Ashurst
company as a driller on its San Benito lands from October,
1900, to June, 1901; that he assisted in sinking a number of
wells on said lands during his employment with the cor-
poration, but at no time did he strike oil or observe oil indi-
cations.   After ceasing work for the Ashurst, he was employed
by another company on a section of land adjoining the lands
of the Ashurst company, and for several years worked in that
vicinity and frequently visited the Ashurst's properties to
see whether oil had been found thereon; that during all those
years oil was not struck on said properties, nor were there any
perceptible indications of oil on said lands.   This witness
admitted writing a letter to Abrams in which he asserted that
oil had been found on the property of his company, but he
declared that he did not state the truth in said letter, his
explanation being that Abrams had requested him to misrep-
resent conditions, if necessary, so that he (Abrams) could
effect a sale of the stock, the latter saying, "Report a little
oil whether you have it or not—it will help me out selling
stock."  Therefore, "when," said the witness, "we struck
sulphur gas it was reported as oil gas."

There was other testimony given which disclosed that the
representations made to Krogh by Abrams concerning the
business and property of the Ashurst company before Krogh
purchased stock therein were grossly at variance with the
true condition of the corporation's affairs.

As stated, the court found that the representations made by
Abrams were false and untrue, and so known to be by Abrams
when he made them, and that Krogh, relying upon such
representations, bought the stock.

It is only necessary to compare the findings with the evi-
dence, of which we have presented only a brief synopsis, to
make it readily manifest that the attack upon said findings is
wholly devoid of merit.  But counsel for appellant point out
a number of apparent inconsistencies in the testimony of
Krogh, and upon these build up the argument that his testi-

mony is inherently improbable and unbelievable, and that it should have been disbelieved and wholly discarded by the trial court. But it is obviously a mistake to suppose that, because a witness may make inconsistent statements in the course of testimony given by him, such testimony is, in its entirety, to be disbelieved. The rule, "*Falsus in uno, falsus in omnibus,*" does not mean that a witness' entire testimony must necessarily be disregarded or disbelieved because there may be found falsehood in certain parts of it. The rule merely means that where the witness is found to have sworn falsely in a certain material part of his testimony, his entire testimony *may* for that reason be rejected. But no one will attempt to challenge the right of a jury or a judge, trying the facts, to believe and credit certain parts of the testimony of a witness who has been shown to have sworn falsely as to certain other material parts thereof. However, this rule is one which cannot well be invoked in a court of appeal on a review of the facts. It, like any other rule which may be resorted to by triers of facts for the purpose of weighing testimony and measuring the credibility of witnesses, is intended as a guide to those who must hear and see the witnesses and thus receive the evidence at first hand. It is only stating a commonplace to say that on a trial of issues of fact, the evidence addressed to the disputed point must satisfy the jury or the judge trying such issues. When a verdict or findings are supported by some evidence which is not, upon its face, improbable or unbelievable, the presumption is that the jury or the judge have been satisfied by such evidence to the extent of warranting the conclusion reached, and that in considering the evidence, no arbitrary method has been pursued, but that all the rules by which weight and credibility are tested have been their sole guide in arriving at the final determination. It is, therefore, not within the province or the right of reviewing courts to declare that the minds of the jury or judge who tried the facts had not been *satisfied* by the evidence from which the verdict or findings have been educed.

It is to be presumed that the judge, in the case at bar, reconciled and accounted for, to his own satisfaction, any and all inconsistencies which might have been made to appear in the testimony of Krogh, and it may be, for aught that

appears from the record to the contrary, that what seem to be contradictory statements in his testimony were not the result of a desire or an intention to make a false statement, but were due to mistake, or, it may be, to a treacherous memory. But whatever may have been the particular view or the character of the analysis of Krogh's testimony by the trial judge, to whom the determination of the questions of fact was submitted, his findings, no doubt based largely on Krogh's evidence, are conclusive upon this court.

In connection with the discussion of the alleged failure of the evidence to support the findings, appellant declares that "manifestly the principal inducement for Krogh's buying the stock was the suggested marvelous increase in value from seventy-five cents per share to $60 per share inside of six months' time," and the contention is made that such representation involved a mere expression of opinion, "or wild irrational speculation, and is not legal evidence to establish fraud."

It is true, as a general rule, as the authorities hold, that fraudulent representations cannot be predicated of a mere expression of opinion, however erroneous such opinion may be or however positively stated. (*Johnson* v. *Johnson,* 134 Cal. 662, [66 Pac. 847]; *Lee* v. *McClelland,* 120 Cal. 147, [52 Pac. 300]; *Lloyd* v. *Kehl,* 132 Cal. 107, [64 Pac. 125]; *Colton* v. *Stanford,* 82 Cal. 398, [16 Am. St. Rep. 137, 23 Pac. 16]; *Oppenheimer* v. *Clunie,* 142 Cal. 317, [75 Pac. 899]; *Henry* v. *Continental Building etc. Assn.,* 156 Cal. 675, [105 Pac. 960].) But, as is clearly pointed out by the supreme court in *Henry* v. *Continental Building etc. Assn.,* 156 Cal. 675, [105 Pac. 960], this rule "is subject to some qualification. A party inducing another to contract in reliance upon estimates or opinions professedly based upon alleged facts known to the party stating them to be nonexistent will not be permitted to escape responsibility by the plea that he was merely declaring his opinion."

The testimony of Plaugher, the corporation's driller, distinctly shows that Abrams' representations to Krogh with regard to the probable future value of the stock involved more than a mere opinion. It discloses, if anything at all, deliberate design on the part of Abrams to mislead all persons to whom he might attempt to sell stock as to the actual condi-

tions of the corporation's business and properties. "Report a little oil whether you have it or not," was his injunction to Plaugher, and, he added, "it will help me out selling stock." It is very evident, not only from Plaugher's testimony, but from other evidence adduced at the trial, that, so far as the prospective increase in the value of the stock was concerned, Abrams' opinion was "based upon alleged facts known to him to be nonexistent."

2. But it is vigorously insisted that, conceding the representations to which Krogh testified had been made by Abrams and that they were false, still the defendant cannot prevail, since it is clear that opportunity to ascertain for himself whether such representations were true or false was readily available to him; that he had the means of acquiring knowledge of the facts for over three years, and that, having negligently failed to prosecute an inquiry to that end, he cannot now maintain the plea that he was misled and deceived thereby and so escape the consequences of his obligation.

It is doubtless well settled law that, where one undertakes to secure, upon the ground of misrepresentation and fraud, restoration of the consideration which supported an executed contract, he cannot prevail, if it be made to appear that he could, by the exercise of ordinary prudence or diligence, have detected the fraud, or have ascertained facts which would have disclosed that the representations were false and fraudulent. There is no ellipsis in a long line of authorities to this effect. As is said by Chancellor Kent, in the second volume of his great work, page 485, "the law affords to everyone reasonable protection against fraud in dealing; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." (See *Rockafellow* v. *Baker*, 41 Pa. 319, [80 Am. Dec. 624]; *Saunders* v. *Hatterman*, 24 N. C. 32, [37 Am. Dec. 404]; *Brown* v. *Gray*, 51 N. C. 103, [72 Am. Dec. 563]; *Lee* v. *McClelland*, 120 Cal. 147, 151, [52 Pac. 300].)

In the first place, we cannot say that Krogh had accessible means of ascertaining whether the representations were false or true. The lands and the business of the corporation were situated and managed in other counties than the one in which Krogh resided and where the representations and the con-

tract were made. Krogh, so far as we are advised to the contrary by the record, was not an expert in oil lands or the oil development business, and it is highly probable that had he inspected the properties of the corporation, he would not have added any more wisdom on the proposition to that which he had acquired in listening to the tale so seductively unfolded before his mind by Abrams. Abrams' business was that of an oil land promoter—at least, he had been engaged in the oil land business for a long period—and Krogh was undoubtedly made to·believe by him that he (Abrams) possessed full and perfect knowledge of the oil development business in general and of the corporation's business and prospects in particular. Abrams had thus ingratiated himself into the confidence of Krogh to such an extent that the latter placed implicit reliance upon every representation that he made. Krogh declared that he believed the representations, and we think that, under the circumstances, he had a right to rely upon facts which were not, and could not be expected to be, within his own knowledge. (*Bank of Woodland* v. *Hiatt,* 58 Cal. 237; *Mead* v. *Bunn,* 32 N. Y. 275.)

But, assuming it to have been the duty of Krogh to investigate for himself before purchasing the stock, the case here does not come within, nor is it to be decided on, the principle laid down by Mr. Kent. Here the plaintiff seeks to recover on an executory contract. The defendant appeals to the equity side of the court and declares that the plaintiff should not be permitted to enforce the contract, because, as he charged, the same was procured through fraudulent representations. A court of equity is a court of conscience, and will under no circumstances enforce, or permit to be enforced, the terms of a contract founded in fraud, even if there existed and were accessible to the defendant the means and opportunity to detect such fraud by the exercise of ordinary prudence.

In *Rockafellow* v. *Baker,* 41 Pa. 319, [80 Am. Dec. 624], cited by counsel for appellant, it is said: "No doubt the plaintiff parted with property most foolishly. If the suit were upon an executory contract, we would not enforce it. The total failure of consideration would be a sufficient reason. And such ruling would be according to the doctrine of *Bellas* v. *Hays,* 5 Serg. & R. 427, [9 Am. Dec. 385] , *Geiger* v. *Cook,*

3 Watts & S. 266, and numerous other cases cited in the argument. But the contract is not executory. It has been fully executed by the parties. They asked no aid of equity to enforce it. Our interposition is invoked, not to carry out and accomplish what the parties have begun, but to undo what the parties have accomplished.''

As seen, the defendant here, in response to plaintiff's demand in a court of law, has, not alone by the interposition of an equitable defense, but by a cross-complaint, brought the plaintiff within the cognizance of the equity side of the court, and has, upon appropriate allegations, asked relief from the consequences · of an alleged fraudulent and unconscionable executory contract. As stated, a court of equity, upon the principle that he who comes into equity must do so with clean hands, could under no circumstances lend its aid to enforce, or allow, where asked to prevent it, the enforcement .of an unexecuted contract which the chancellor finds, upon sufficient evidence, was brought about through deceit and fraud. There may be in a given case no inconsistency between a refusal by a court of equity to enforce the specific performance of a contract and a refusal to rescind the same contract, and, in the case at bar, whether the defendant was entitled to affirmative relief or not, it was nevertheless the duty of the chancellor to refuse to allow the plaintiff to enforce or recover upon a contract that was, according to evidence which appeared to satisfy the mind of the judge, conceived in and consummated through fraud.

The case of *Lee* v. *McClelland,* 120 Cal. 147, 151, ·[52 Pac. 300], will be found, on examination, to be entirely different from this case in almost every material respect.

3. The counterclaim for $5,000, pleaded by the defendant and allowed by the court, arose under the following circumstances: In the year 1905, and subsequently to the date of the transaction culminating in the execution by the defendant of the promissory notes, of which the note declared upon is one, Abrams went to Fresno, where he had a. conversation with Krogh concerning an oil company known as the ''Pacific Gateway Oil Company.'' Krogh testified that, in said conversation, Abrams stated that Brandt had sent him (Abrams) to Krogh for the purpose of inducing the latter to buy ''a one-eighth interest in the Pacific Gateway Co.'' Abrams said

to Krogh that all those interested in said company had paid for their shares, except one Dave Wolf, who had failed to pay for his stock; that Wolf's interest, as were likewise the respective interests of the other shareholders, was of the value of $5,000. He stated to Krogh that if he (Krogh) would take Wolf's interest in the Gateway and pay $5,000 therefor, the company would thus be able to "square up." The agreement was, so Krogh testified, that, upon the payment of $5,000, he should not only receive the one-eighth interest of Wolf in the Gateway, but that one of the notes heretofore referred to as having been made by Krogh in favor of Brandt would be canceled and returned to Krogh as paid.

Krogh accepted this proposition and borrowed money from a Stockton bank, with which he paid the $5,000. It appears that said money was left on deposit in the bank by Krogh, who ordered it paid to Brandt with the understanding that it should be paid into the Gateway company. Brandt, it seems, instead of so utilizing said $5,000, applied the sum on the payment of Krogh's notes, one having thus been fully paid, and the balance of the sum thereupon remaining being credited on the note involved in this action.

Krogh, as may be understood from what has thus far appeared of the Gateway transaction, denied that said sum of money had anything to do with or was intended to be applied on the notes, and as tending to corroborate this testimony a document, executed by the parties after the execution of the notes, was introduced in evidence, by the terms of which the times at which said notes would mature were definitely fixed, the note bearing interest at six per cent per annum having thus been made collectible two years after the date of its execution and the note providing for seven per cent per annum made payable three years after the date of its execution. The probative significance of this agreement is in the fact that the payment of the $5,000 to Brandt was at a time anterior to the date of maturity of either of the notes under the terms of said agreement.

Krogh never received the 25,000 shares or Wolf's one-eighth interest in the Gateway company.

The fact is undisputed that the note which Brandt and Abrams claimed was paid by the application thereto of such

part of said sum of $5,000 as was necessary to fully satisfy it never was sent or returned to Krogh.

By cross-examination it was sought to be shown that Krogh, after paying the $5,000, agreed to dispose of his interest in the Gateway company for $115, the purpose of this proof being, manifestly, to discredit his statement that he had invested $5,000 in that concern. There was introduced in evidence an instrument, signed by Krogh, purporting to assign and transfer, in consideration of the sum of $115, all his interest in the Gateway to Brandt. Krogh admitted the execution of said instrument, but explained that it was intended as a mere formal transfer to Brandt, all the other stockholders having executed a similar assignment, to enable him (Brandt) to sell the property of said company to some eastern people who were negotiating for its purchase, the proceeds of said sale to be divided equally among the stockholders. This, Krogh said, is what Brandt represented to him when he requested the assignment. Krogh stated that he never received the $115 mentioned in said assignment.

Upon the testimony thus briefly narrated the court found that said sum of $5,000 had been diverted by Brandt from the purpose for which it was paid, and that Krogh knew nothing of the misapplication of said sum of money until the time of the institution of this action, and that Krogh had never received Wolf's or any shares of stock in the Gateway.

The finding as to this sum of $5,000 is amply supported by the evidence.

4. Certain rulings of the court are assigned as prejudicially erroneous. The most important of these assignments is involved in the exception to the overruled objection to the testimony of the wife of Krogh.

Mrs. Krogh, it will be recalled, was present at the time of the conversation held in the month of July, 1904, at her residence, between Krogh and Abrams. The objection to her testimony concerning said conversation was in effect upon the ground that it did not appear that Abrams had authority at that time to act for Brandt in the sale of any stock in the Ashurst company.

It does not affirmatively appear from the record whether Abrams was or was not the personal agent of Brandt, authorized to sell stock for him in the Ashurst company, in the

month of July, 1904, when the former first conversed with
Krogh relative to the Ashurst oil properties.  It is, of course,
only elementary to say that the declarations of a party can
bind no one but himself, unless such declarations are made
in his capacity as an agent of another party and are within
the scope of his powers or authority as such agent.  And it
is furthermore a well-established principle that a party deal-
ing with an agent, who is acting within the scope and au-
thority of his employment, is to be considered as dealing with
the principal himself.  In the case of a contract, if the agent,
at the time of making the contract, makes any representation,
declaration or admission, whether true or false, touching the
matter of the contract, it is treated as the representation,
declaration or admission of the principal himself.  (Story on
Agency, 9th ed., p. 152.)

Abrams testified that, while he had no special agreement
with Brandt before he sold the stock to Krogh, he, in a gen-
eral way, looked after his affairs "as well as my own," and
we think it is fairly inferable from the whole transaction,
as it is exposed by the evidence, that Abrams' sole purpose in
visiting and interviewing Krogh in the month of July, 1904,
was to infuse into the latter's mind false views as to the con-
dition of the Ashurst Oil Company's oil lands and business,
in the hope, thereby, of laying the foundation for dumping a
large block of worthless stock, of which Brandt, either for the
corporation or himself, was anxious to dispose, into the lap of
Krogh in return for a large sum of money.  In other words,
we think that, from the whole record, the court below was
justified in drawing the inference that Abrams was acting for
Brandt in the month of July, 1904.  That Abrams had some
motive when taking the pains on that occasion to regale Krogh
with the marvelous tale of the existing promising conditions
of the corporation and its business, is very apparent, and
that his design was, in his first conversation with Krogh, to
sell the latter Ashurst stock, is inferable from the testimony
of Plaugher, the driller, according to which Abrams knew
the utter worthlessness of the corporation's lands as oil pro-
ducers, for, as seen, he urged Plaugher to make favorable re-
ports of the development operations, regardless of whether
such reports were based upon fact or falsehood.  His desire
to sell the stock was at all times the point uppermost in his

mind. He, beyond peradventure, knew, and it would be absurd to say there were any of the stockholders who did not as well know, at the time Krogh was first interviewed by Abrams relative to the Ashurst, that the corporation's lands in San Benito county had been sufficiently tested and experimented with to plainly demonstrate that, as oil properties, they possessed absolutely no value, and that, therefore, whatever could be realized on the sale of the stock in the corporation would amount to just so much gain to the promoters of the concern. Besides, Abrams was the manager of the corporation in the month of July, and as such was as much the agent of Brandt as he was any of the other members of the corporation. Brandt was a director, and had, with the other directors, executed a note at a bank on which they had received money with which they had paid the corporation's debts. The object in selling stock was to secure money with which to reimburse Brandt for taking up said note, and Abrams was directed to sell stock for that purpose.

Moreover, it does not appear from Mrs. Krogh's direct testimony that she referred to the conversation had in July, 1904. She stated that "I was present at a conversation in 1904 between Mr. Krogh and Mr. Abrams regarding the sale to Mr. Krogh of some oil stock in the Ashurst Oil Company. I remember the conversation." She was then asked to state the conversation and the representations that were then made by Abrams concerning the Ashurst Oil Company. The objection to this question was, as seen, that it called for testimony that was "incompetent, irrelevant and immaterial," and not binding on Brandt, and the objection overruled. It did not appear that the conversation to which Mrs. Krogh referred took place in the month of July, 1904, until the fact was brought out on cross-examination, and we think it was the duty of counsel, in order to avail themselves of the objection here, to have then moved to strike out Mrs. Krogh's testimony, which they failed to do. On its face, the direct testimony appeared to be material, relevant and competent, and, while from the testimony of Krogh previously given it appeared that Mrs. Krogh was present at the conversation held in July, the court would not have been justified in assuming, from his testimony alone, that Mrs. Krogh intended to give the details of that particular conversation. To the contrary,

the court could not but assume, until it otherwise appeared from her testimony, that she referred to some conversation which would relevantly respond to the issues raised by the answer and the cross-complaint.

That portion of Krogh's testimony relating to his conversation with Abrams and the latter's statements in July, 1904, was objected to and the objection overruled. The same contention is here made with regard to this ruling as is made concerning the ruling admitting Mrs. Krogh's testimony of said conversation and statements. What we have said generally respecting the ruling admitting her testimony applies with equal force to the objection here referred to. It may, however, be added, with regard to the objection to Krogh's testimony detailing the statements made by Abrams in the month of July, that substantially the same statements and representations were made by Abrams in the month of September, when Krogh bought the stock, and testimony thereof given by Krogh.

The question asked plaintiff on cross-examination and objected to by his counsel as to who constituted the membership of the Pacific Gateway Company was not, strictly viewing it, proper cross-examination; yet the answer thereto was harmless in view of the fact that later in the trial the matter of the organization and existence of the Gateway was necessarily gone into, and some of the members of that corporation who were named by plaintiff in response to the question testified and referred to their connection with that corporation.

The admission in evidence of a letter from the secretary of the Ashurst Oil Company to Krogh, assuming that the ruling admitting it was error, was without injury to plaintiff. The letter contained nothing of probative importance but a statement from which it could be inferred that Krogh had actually bought stock in the Gateway company. The allegations in the cross-complaint regarding this transaction are not denied in the answer thereto. In this state of the pleadings on this proposition it was, obviously, unnecessary to introduce proof that Krogh had in fact bought stock in the Gateway, the fact having been in effect admitted by a failure to deny it. (*Wells* v. *McPike,* 21 Cal. 216; *West Coast Lumber Co.* v. *Newkirk,* 80 Cal. 280, [22 Pac. 231]; *Curran* v. *Kennedy,* 89 Cal. 98, [26 Pac. 641].)

Abrams, having testified that he had examined and found indications of oil on lands belonging to other parties and situated in the neighborhood of the lands of the Ashurst corporation, was asked: ''How close to the property of the Ashurst Oil Co. did you discover oil indications or seepages?'' To this question an objection was made by the defendant and sustained by the court, and it is claimed that prejudicial error was thus committed. But, while it would probably have been proper to have allowed an answer to the question, we think the ruling was harmless: Abrams had previously testified that the lands, not belonging to his corporation, which he had inspected and on which indications of oil were observable, adjoined the properties of the Ashurst company. Besides, there was no effort made by the plaintiff to show, nor was there any pretense, that there were indications of oil on the Ashurst properties which would justify the prognostication that the value of the stock would reach $60 per share within six months. In fact, there was not any serious attempt made by the plaintiff to show that there were oil indications on the lands of his corporations to any significant extent.

There are some other rulings admitting and rejecting evidence complained of by appellant, but we cannot perceive any harm which could have resulted therefrom to plaintiff, conceding that some of them were not strictly correct.

5. The appellant, on his motion for a new trial, and in support of the claim of ''newly discovered evidence'' and of having been taken by ''surprise during the trial of said action which ordinary prudence could not have guarded against,'' filed a number of affidavits in which it is alleged that, after the trial and the rendition and entry of judgment, a number of letters written by Krogh to Abrams, containing important admissions by the defendant in conflict with his testimony, were found in the possession of Cohn, the secretary of the Ashurst company. These letters are set out and made parts of said affidavits.

It appears very clear from these letters that the only use to which they could have been put at the trial by the plaintiff would have been for the purpose of impeaching Krogh's testimony, and it is well settled that where the only purpose or effect of newly discovered evidence is the impeachment of an adverse witness, a new trial will not be granted on that

ground.  (*Chalmers* v. *Sheehy,* 132 Cal. 459, [84 Am. St. Rep. 62, 64 Pac. 709] ; *Wood* v. *Moulton,* 146 Cal. 317, [80 Pac. 92] ; *Hamm* v. *Romine,* 98 Ind. 77; *Gardner* v. *Kellogg,* 23 Minn. 463; *James* v. *Oakland Traction Co.,* 10 Cal. App. 802, [103 Pac. 1082], and cases therein cited.)

Furthermore, the affidavits on their face do not make a very strong showing in the matter of the exercise of diligence on the part of plaintiff to procure said "newly discovered" evidence.　One of the plaintiff's own witnesses had access to, if, indeed, not possession of, all the correspondence between Abrams and Krogh, and when requested before the trial to do so, turned over to one of plaintiff's attorneys all such correspondence as he could find.　The discovery of the letters forming the basis of the alleged newly discovered evidence was made after a "thorough search," as the attorney's affidavit describes the effort resulting in their discovery, after the trial was had and judgment entered against plaintiff. Admitting that the newly discovered evidence was of a sort that would justify the granting of a new trial, there is not, in our opinion, such a showing of diligence in the efforts put forth by plaintiff to secure said evidence before the trial as would compel the court to exercise its discretion in disposing of the motion favorably to the plaintiff.

Appellant contends that he was taken by surprise "which ordinary prudence could not have guarded against," by the testimony of Krogh to the effect that he and Abrams *jointly* bought the 10,000 shares of stock.　The plaintiff's answer to the cross-complaint alleges that "he has at all times looked to said defendant Abrams as an indorser of said promissory note, to whom he would look for the payment of said note in the event said defendant Krogh was not able to pay said note," and plaintiff testified to the same effect.　After this testimony was given by plaintiff, Krogh asked and was granted leave to amend his cross-complaint, so that it would conform thereto, and the court found that Abrams was not a joint purchaser with Krogh of the stock, but signed the note only as an indorser to secure its payment.

Manifestly, even if plaintiff was surprised by the testimony of Krogh on this point, it cannot be said that he suffered any injury from such testimony, since Krogh acquiesced in and the court found with plaintiff's theory as to the relations

between Abrams and Krogh in the transaction. ''Surprise,'' as used in the statute prescribing the grounds on which a motion for a new trial may be urged, denotes ''some condition or situation in which a party to a cause is unexpectedly placed, to his injury, without any default or negligence of his own, which ordinary prudence could not have guarded against.'' (Bouvier's Law Dictionary; Anderson's Law Dictionary; *McGuire* v. *Drew,* 83 Cal. 229, [23 Pac. 312].)

It is a rule thoroughly settled and understood that the party moving for a new trial on the ground of surprise must not only show surprise, but must show that injury resulted to him from the cause of such surprise, and this can be done only by showing that he could establish an entirely different case favorable to himself in the event that a new trial be granted.

After a painstaking examination of the record before us and the points urged for a reversal, we have been unable to discover a just reason for disturbing either the judgment or the order, and both are, therefore, affirmed.

Burnett, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 7, 1910.