Filed 1/7/21  P. v. Yu CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B299439 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457678) |
| v. | |
| JASON YU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Spolin Law, Aaron Spolin, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen,

Supervising Deputy Attorney General, Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

―――――――――――――

The jury found defendant and appellant Jason Yu guilty of sodomy by force (Pen. Code, § 286, subd. (c)(2)(A)[1] [count 1]), forcible oral copulation (former § 288a, subd. (c)(2)(A) [count 2]), assault with intent to commit rape, sodomy, and oral copulation (§ 220, subd. (a)(1) [count 3]), and false imprisonment by violence (§ 236 [count 4]) of Mariana V.; kidnapping to commit rape of Airam H. (§ 209, subd. (b)(1) [count 5]); sodomy by force (§ 286, subd. (c)(2)(A) [count 6]), assault with intent to commit rape, sodomy, and oral copulation (§ 220, subd. (a)(1) [count 7]), false imprisonment by violence (§ 236 [count 8]), and criminal threats (§ 422, subd. (a) [count 9]) against Eva E.; and kidnapping to commit sodomy (§ 209, subd. (b)(1) [count 10]), sodomy by force (§ 286, subd. (c)(2)(A) [count 11]), and forcible rape (§ 261, subd. (a)(2) [count 12]) of Maritza M.

With respect to counts 1, 6, 11, and 12, the jury found true the special allegation that Yu committed an offense specified in section 667.61, subdivisions (b) and (e)(4). With respect to counts 11 and 12, the jury found true the allegation that Yu kidnapped the victim in violation of section 207, 208, or 209.5 within the meaning of sections 667.61, subdivision (b) and (e)(1), and that Yu's movement of

―――――――――――――

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the victim substantially increased the risk of harm to her within the meaning of sections 667.61, subdivisions (a) and (d)(2).

The trial court sentenced Yu to a determinate term of eight years in state prison, plus an indeterminate consecutive term of life, plus a term of 80 years to life.

On appeal, Yu contends that the trial court erred by (1) refusing to grant a continuance without following statutory procedure, (2) refusing to allow him to discharge retained counsel without a hearing, and (3) admitting evidence of prior uncharged sexual offenses.  Yu further contends that there is not sufficient evidence to support the convictions in any of the 12 counts against him.

We affirm the trial court's judgment.

**FACTS**

*Mariana V. (Counts 1-4)*

Mariana, who was 60 years old at the time of the crimes, had 12 prior convictions for prostitution, and sometimes worked as a prostitute, but she was not working on the night of April 21, 2017.  She was on a street that was known for being a place to meet men and do drugs, when Yu stopped in front of her in a nice BMW.  He asked if she wanted to party, which she understood to mean "go someplace, maybe sit around, conversation, food," as well as

use drugs.  She was hungry and hypoglycemic, so she got into Yu's car.

As they drove around, Mariana told Yu she was hungry.  He asked if she liked to get high, and she said yes.  Mariana pointed out several places to eat as they drove, but Yu did not stop.  He said he wanted to take her to a nice hotel.  They went to a motel, and Mariana asked if they could get food and cigarettes.  Yu said they could use the phone in the room, so they went to the room.  He gave her $50 for food.

Yu told Mariana to sit on the bed, so she did.  His manner changed suddenly, and he pushed her down onto the bed "real hard."  He put his arm around her, and she told him to slow down.  He then said, "Shut up, bitch."  Mariana started screaming.  Yu mocked her and tried to tear her clothes.  Mariana was wearing an expensive skirt, and she was afraid Yu would damage it, so she offered to take it off.  Instead, Yu pulled it up to her waist.

Yu tried to penetrate Mariana's anus with his penis.  She told him to stop.  He was unable to penetrate her.  He pulled out a pipe and smoked it.  He said, "Whoa, I'm really horny now."  He tried to penetrate her anus about five times, but was unable to.  She repeatedly told him to stop.  Eventually Yu penetrated her, and it was "very painful."

At some point, Mariana pushed Yu away, and ran for the door.  Yu pushed a table in front of the door and jumped on top of it.  He acted nice again and said, "Come on.  How come you're trying to get away?"

Yu tried to put his penis in Mariana's mouth, but she fought him. He did not get it inside, but it touched her lips. He put a washcloth in her mouth, and she pulled it out. He put his hands around her neck and choked her. She pushed him away. He put a belt around her neck and tightened it. She put her hand between her neck and the belt to prevent him from strangling her.

Mariana told Yu she had to pee and got up. Yu jumped off the bed and tried to stop her, but she went into the restroom and locked the door. Yu tried to get in, but she kept the door locked.

Another guest at the motel heard arguing for about 10 to 15 minutes and called 911. He heard a woman yelling: "Help. Call 911. I'm getting raped."

Los Angeles County Sheriff's Deputy Andrew Morse responded to the scene in the early morning hours of April 22, 2017. He heard a woman inside a room saying, "Help." He got a key from the manager and entered the room. The woman had locked herself in the restroom. She looked frazzled and relieved to see the deputies. Deputy Morse noticed an empty jar of Vaseline on the nightstand. Mariana told the deputies what happened, and they transported her to the hospital.

Deputy Morse got a copy of Yu's identification from the motel manager as the person who rented the room. Yu was not in the room or in the area of the motel.

Nurse Carolyn Clark conducted a Sexual Assault Response Team (SART) examination. The nurse described

Mariana as petite and disheveled—her makeup was running down her face and her hair was messy. Mariana told the nurse that Yu used Vaseline and put his mouth on her anus. The examination revealed no injuries to Mariana's anus. Her vagina, near the urethra, was red and possibly bruised. Inside her mouth, her left cheek had small, red abrasions. The findings were consistent with Mariana's report of what happened. Mariana told the nurse that Yu had put a pillow over her face, causing her to urinate. The nurse later testified that when a person is deprived of oxygen, even for 15 seconds, it can cause a loss of bladder control.

DNA from Mariana's left breast contained a mixture of three people's DNA, with Yu as the major contributor; no conclusions could be drawn about the minor contributors. DNA from her right breast was a mixture, with Yu as a possible contributor.

### Airam H. (Count 5)

Around 9:00 p.m. on February 26, 2012, 24-year-old Airam was waiting for the bus in El Monte to go to work as a food packer. She was running late and had just missed her bus. Yu pulled up in a black Mercedes and asked if she wanted a ride. She declined, and Yu said, "Don't be scared. I'm not going to do nothing to you." He said his name was Jason and told her he would take her where she needed to go. She noticed a suit in his backseat, which made her think he was on his way home from work. He seemed honest.

Airam got in the car and gave Yu her work address. As they were driving, Yu put his hand on her breast over her clothes. She removed it and asked him "if he could please not do that." He looked angry. Instead of turning right to get on the freeway toward her work, Yu turned left. Airam repeatedly told him to stop the car, but he did not. She did not know where they were.

They talked in the car. Yu told Airam she had a beautiful body. He said he was surprised she had two children. He told her he wanted to put his mouth on her vagina. She was upset and uncomfortable and told Yu she wanted to leave. He told her to think about her kids because she was all they had. He told her she could give him a lap dance instead of going to work. She did not know what a lap dance was. She kissed him to get it over with and asked, "That's what you want?" He asked why she insisted on going to work when she could make more money with him. He put about $150 in her hand. She threw it back at him. He put it back in her hand.

Yu stopped at a motel and went to the office. Airam tried to open the car door but could not. She was nervous. Yu returned and said they could go to the room, but Airam said, "I am not going to the room." He got upset because he had already rented the room. When she refused to go with him, he grabbed her phone and went into the room. She followed him but did not go inside. She was desperate to get the phone back because it had pictures of her children, and she had texted her address to a friend.

Airam threw the money at Yu and said, "I just want my phone." He said, "Come and get it." He threw the money back at her, and she picked it up. She was going to put it under his windshield wiper, but he walked toward her, so she ran away.

Airam felt ashamed and stupid for accepting the ride. Her coworker encouraged her to call the police, and her supervisor drove her to the police station the next day. She had reported a previous incident to the police, but they did not do anything. To ensure the police helped her this time, she lied and told them Yu had grabbed her and pushed her into his car.

On February 28, 2012, El Monte Police Officer Gerardo Cueva located Yu in a room at the Siesta Motel. Yu identified his car, which was a 2008 BMW. Officer Cueva recovered Airam's cell phone from Yu. Yu admitted it belonged to a woman.

El Monte Police Detective Jeff Girgle interviewed Yu on February 28, 2012. Yu drove a BMW and admitted picking up a woman at a bus stop because "[h]e wanted to spend some time with somebody." His intention was not specific to sexual intercourse. He said the woman he picked up was not a prostitute; she was more of a "working girl" because she had two children. Unprompted, he said that he did not kidnap her or point a gun at her. He said he was a Christian and would not have sex with someone he picked up.

8

Yu said they drove around El Monte until he pulled into a trailer park to buy methamphetamine. He then drove to a motel on Garvey Avenue. It was a mile or two from the bus stop where Yu picked up Airam. Yu said that he offered Airam $120 to compensate her since he did not let her go to work, and she took it. He was upset that she did not stay and have sex with him even though he gave her money.

### Eva E. (Counts 6-9)

Eva met Yu through a mutual friend a week prior to the assault. He seemed really nice. They spoke on the phone and exchanged messages. She never had sex with him or sent him a sexual message. On the evening of March 31, 2016, Eva called Yu and asked him to take her to a friend's house because she did not have a place to stay. He offered to get her a motel room and said he would "just chill with [her] for a little bit" and then leave. He picked her up; he had a nice car, but it broke down a short distance from the motel.

Once inside the motel room, Yu and Eva smoked crystal meth.[2] Yu gave her $20, and she walked to 7-11 to buy lottery scratchers.

When she returned, Yu lay on the bed and told Eva to "come lay down with [him]." She declined. He offered her money to have sex with him. He showed her about $200, but

---

[2] Eva was a recovering drug addict and but had not taken drugs for two years at the time of trial.

9

she said, "No."[3]  Yu told Eva he was "going to have his way" whether she took the money or not.  She "felt like [she] was in big trouble."

Yu pulled out his penis and told Eva to play with it.  He stroked himself and put on a condom.  She was uncomfortable and said she wanted to leave.  She went to the door and started unlocking the four locks, but Yu pulled her away.

Eva had almost gotten the door open when Yu grabbed her throat and choked her.  She pulled pepper spray from her bra and sprayed his eyes and penis.  He said, "I can't believe you did this to me, bitch."  She hit him in the head with the room phone.  Yu threw her onto the bed on her stomach and put his full weight on her.  He choked her with his left arm around her neck.  He pulled down her pants and put his penis in her vagina and her anus.  She was in a lot of pain and thought he was going to kill her.  She repeatedly told him to stop and tried to fight back.

Yu stopped, and said, "[I]t burns, it burns.  I can't believe you did this.  I'm going to kill you."  She believed him because of the look on his face and the way that he had been choking her.  She told him to put water on the areas to ease the pain because she had heard that water would make the pepper spray hurt more.  He went to the restroom, and Eva grabbed her phone and called 911.  She unlocked the door,

---

[3] Eva testified that she had never worked as a prostitute, but she told Los Angeles County Sheriff's Detective Jonathan Bailey that she had previously.

and Yu ran from the restroom to try to stop her from leaving. Eva got out of the room and ran to a church across the street.

On April 1, 2016, at about 9:53 a.m., Monterey Park Police Officer Vincent Vasquez responded to the 911 call. He found Eva at the church across from the motel. She was crying and rubbing her eyes. She appeared frantic and anxious. She would stop talking and "winc[e] in pain while holding her face." Eva described her attacker, and Officer Vasquez located Yu in the motel.

Yu let the officer into the room. Officer Vasquez noticed redness on both sides of Yu's head and above his left eyebrow. He had an orange-colored stain on his face. His shirt also had orange stains. His arm had bite marks, and the back of his head was scratched. The room looked and smelled like a lot of pepper spray had been discharged. Pepper spray stains were on the headboard and a lamp. There was money in the room, and a condom in the trash can. There was a pepper spray can near a container of Vaseline.

Photographs showed redness around Eva's neck, and a bite mark on her right shoulder. Her right arm was red where Yu had squeezed and held her. Her right leg was bruised.

Nurse Marcellina Johnson conducted a SART examination of Eva. Eva was crying and appeared to be sad, dejected, and upset. She had abrasions and bruises on her

body, as well as a bite mark on her shoulder. Bruising and abrasions on her anus indicated anal penetration.

A swab of the interior of a condom from the motel room contained a mixture of at least three contributors, including Eva as the major contributor. The exterior was a mixture of at least three contributors, with Yu's and Eva's profiles included as possible contributors.

Monterey Park Detective Denise Ferrari processed Yu's BMW. Pills that appeared to come from a box of Rhino Stamina Erection pills were scattered on the floorboard throughout the car. A glass pipe was located under the steering column.

Eva remained scared of Yu at the time of trial. She was afraid he would kill her if he was released. She did not know anyone named Airam or Maritza.

### Maritza M. (Counts 10-12)

On January 29, 2017, at about 6:00 p.m., Maritza was walking home when Yu stopped his car next to her and rolled down his window. It was getting dark. Yu pulled out his wallet and said, "Look, money. A lot of money." Maritza believed Yu mistook her for a prostitute, and she said "No, thank you." She continued walking, and Yu's car slowly followed. He repeatedly offered her money, and she said, "No, thank you. No, thank you. No, thank you."

After about 20 minutes, Yu got out of his car and grabbed Maritza. He buckled her into the front seat and

"locked everything." She tried opening the car doors but could not. She pleaded with Yu repeatedly and said she had a daughter at home waiting for her. She showed him a photograph of her daughter. He said, "Shut up. Shut up."

Yu turned around and drove to a dark, isolated area where he parked. Maritza did not know where they were. Yu got out, opened Maritza's door, and pulled her out of the car. She did not speak English, but she repeatedly asked him to let her go in Spanish. Yu put her in the back seat and grabbed her breasts and buttocks. Maritza showed Yu her phone, but he grabbed it and threw it outside the car. Yu removed Maritza's shoes and pants, as well as his own pants. She repeated "No, no, please," but he continued. Yu penetrated Maritza's vagina with his penis. He turned her over and penetrated her anus. He had a "very big thing," and her anus burned and bled. She felt desperate and thought she was going to die.

When Yu was finished, he got dressed and left Maritza there, "undressed and hurt and in pain." She was crying. She got dressed, and walked until she saw a woman who told her which way Garvey Street was. The woman asked what happened, but Maritza did not want to tell her. Maritza "walked and walked until [she] reached Garvey." She did not have money, but she got on a bus and asked the driver to let her ride for free. She was crying, and the driver saw "the way [she] looked" and let her on the bus. She had trouble walking because her private parts were burning.

Maritza got home very late. She was still crying and took a bath to try to ease the burning sensation. Her daughter, who was 17 years old, asked what had happened and why she was so late, and Maritza told her. Her daughter called Maritza's son.

Maritza's son took her to the Los Angeles County Sheriff's Station where Deputy Victor Benavidez spoke to her. She was crying continuously and appeared sad, like she had just been through a traumatic experience. Deputy Benavidez and his partner took Maritza to the San Gabriel Medical Center for a SART examination. Later, Maritza did not remember the examination or speaking to the police. She was not "in [her] right mind at [the] time."

Registered Nurse Cassandre Walsh examined Maritza on January 30, 2017. Maritza was "very tearful throughout [the] interview." She had bruising on her left wrist, left thigh and knee, and right knee. She had multiple lacerations on her anus and perineum. The tears were caused by blunt force trauma. When Nurse Walsh attempted to further examine the area with dye on a cotton swab, the procedure was too painful for Maritza to complete. A few days later, Maritza had blisters around the left side of her waist.

Maritza's underwear tested positive for the presence of semen and blood. DNA from a sample on the underwear was a mixture of Maritza and Yu.

Los Angeles County Sheriff's Detective Liliana Jara interviewed Maritza in her home. It was apparent that

Maritza was in severe pain when she tried to walk. Maritza said that she would not have gotten "involved with a Chinese man." Maritza was able to describe her assailant, so Detective Jara arranged for a sketch artist to draw a sketch. Later, Maritza did not remember meeting with the sketch artist, but she recognized the individual in the sketch as her attacker.

On May 3, 2017, Maritza viewed a "six-pack" photographic lineup, but she was unable to identify Yu's photograph. On May 30, 2017, Maritza was unable to identify Yu in a live lineup. At trial, she did not remember viewing a six-pack or a live line-up. Maritza later sent Yu's booking photograph, which was the same photograph used in the six-pack, to Detective Jara, identifying him as her assailant. She identified Yu at the preliminary hearing. At trial, when she was asked if she recognized anyone in the courtroom, Maritza looked at the jury twice before looking at the entire courtroom and identifying Yu.

Detective Jara searched Yu's BMW. The windows were tinted. The side-view and rearview mirrors were broken. A smoking device for narcotics was in the driver's side area. There was a condom inside the car.

Detective Jara obtained Maritza's cell phone records to triangulate her location based on calls made during the time she was raped. Detective Jara also obtained Yu's cell phone records showing the cell tower locations where his phone was used the night he attacked Maritza. Both Yu's and Maritza's

phones were located about four miles from the motel where Yu claimed to have been that night.

Maritza did not know anyone named Airam, Eva, or Mariana.

### *Interviews of Yu*

Detectives John Bailey and Steve Reid interviewed Yu.[4]  Detective Bailey showed Yu photographs of Airam, Eva, Mariana, and Laura.  Yu repeatedly said he did not recognize or have sex with any of them.  Yu resisted having his DNA taken.

Yu told the detectives he drove a "space" gray, four-door 535i BMW.  Yu had a roommate, but he did not think his roommate had ever driven his car, although he could not be certain.  Yu lost his identification card sometime that month and had to replace it.

Yu said he had been baptized 15 years earlier and could not have sex before marriage because it was against the Bible.  Before he was baptized, he did not like having sex because he felt guilty afterward, so he abstained.  He did not have oral sex because that was considered sex.  He prayed away sexual urges.  He could not give in to his urges because he would not go to heaven if he indulged them.  He would rather die than give in and go to hell.

When asked if he had sex with a woman at the Twilight Motel, which was where Mariana was attacked, Yu

---

[4] A recording of the interview was played for the jury.

first denied it, but then said he did not remember that motel and did not "remember if [he] had sex with somebody over there."

Detective Jara and Detective Marisa Farias interviewed Yu less than a day later.[5]  Detective Jara showed Yu a photograph of Maritza, and Yu said he did not recognize or know her.  Detective Jara falsely told Yu that his DNA was found inside Maritza's anus.  Detective Jara asked if Yu paid Maritza for sex, and Yu said it was possible, but he did not remember if "that was the lady."

Detective Jara said Maritza claimed she defecated when Yu penetrated her anus in the back seat of his car.  Yu responded that he had hired a prostitute but did not recognize Maritza.  He said he did not remember a woman defecating in the back of his car.  He had a new car and "would have gone to a motel.  It would be much more like classic."  He did not like anal sex.

Yu admitted that he "occasionally like maybe part[ied] on the weekends," but he would go to a motel and would pay a prostitute; he would not have sex in the back of his car.  He had money for "high class prostitution" and did not need "to be like back in my car and doing it all over my place."  He said, "And that's the part -- if that's the case, that's why she [is] lying."

Yu said if a woman is selling her body, "[t]hat means she's willing."  He explained, "she don't like (unintelligible) happenings, and she took the money.  And she probably

_____

[5] A recording of the interview was played for the jury.

17

don't like it, whatever, and she make a police report. That's what's messed up. Because she's a woman, and she wanted to do it."

Yu said that "it's usually -- it's not force or anything like that. It's probably, you know, money involved." Yu said he would not do anything with a woman unless she was willing. He believed it was "messed up when they try to, you know, put stuff against me. [¶] . . . [¶] Which they willing to do, and they took the money, right, and that's what's messed up."

Yu was concerned about getting a ticket for prostitution. After Detective Jara reassured him she would not give him a ticket, he admitted taking a woman to a motel for a "business transaction," and that the woman defecated. Yu described picking her up from the street around sunset. He offered her a ride, and she agreed. She said she needed money, and they agreed to the transaction in the car before going to the Valley Motel. He said she "really want[ed] it." Once she said she had to leave, they stopped.

Yu said they were trying to have vaginal sex, and "[m]aybe went the wrong -- probably hit the wrong place or something . . . . [¶] . . . [¶] And then some water come out." Yu later said he did not notice whether anything came out. He said they did not have sex because of his religion, but they "probably were just poking it." Yu said they "didn't even do anything. And [he] still give her the money."

# DISCUSSION

## *Request for Continuance*

During an Evidence Code section 402 hearing just prior to the start of jury selection, Yu requested a continuance because he felt that his counsel didn't "fully know [his] case." The court explained to Yu that defense counsel decides whether to request a continuance. Yu's counsel had declared ready, and was prepared to try the case, so the request was denied.

Yu contends on appeal that the trial court abused its discretion by misinterpreting section 1050, subdivision (d), which outlines a procedure for the trial court to employ when the defense makes an untimely oral motion to continue a hearing.

Section 1050, subdivision (b) requires that to request a continuance, counsel must file "written notice . . . served on all parties to the proceeding at least two court days before the hearing sought to be continued, together with affidavits or declarations detailing specific facts showing that a continuance is necessary." Subdivision (d) provides: "When a party makes a motion for a continuance without complying with the requirements of subdivision (b), the court shall hold a hearing on whether there is good cause for the failure to comply with those requirements. At the conclusion of the hearing, the court shall make a finding whether good cause has been shown and, if it finds that there is good cause, shall

state on the record the facts proved that justify its finding. A statement of the finding and a statement of facts proved shall be entered in the minutes. If the moving party is unable to show good cause for the failure to give notice, the motion for continuance shall not be granted."

Yu has forfeited his contention by failing to request that a hearing regarding good cause be held, or to request that the reasons for the court's denial be recorded in the minute order. (See *People v. Dudley* (1967) 250 Cal.App.2d Supp. 955, 960, disapproved on another ground in *Pryor v. Municipal Court* (1979) 25 Cal.3d 238 ["defendant never objected in the trial court to the failure to record the reasons for the continuance in the minutes . . . [and] . . . cannot raise this question for the first time on appeal"].) Regardless, his claim lacks merit.

Although in isolation the language of section 1050, subdivision (d) may appear to be mandatory (the trial court "shall" hold a hearing and "shall" enter reasons into the minutes), section 1050, subdivision (l) explicitly states that section 1050's provisions are directory, not mandatory. (See *Malengo v. Municipal Court of East Los Angeles Judicial Dist.* (1961) 56 Cal.2d 813, 816.) Accordingly, Yu's argument that the trial court's failure to follow section 1050's procedures necessarily shows the court abused its discretion by misinterpreting the law fails. The trial court's denial of Yu's belated request for a continuance here was well within the court's reasonable discretion, regardless of the failure to follow section 1050's directory procedures. (*People v.*

20

*Henderson* (2004) 115 Cal.App.4th 922, 934 [trial court's denial of continuance reviewed for abuse of discretion].)

### *Request to Discharge Retained Counsel*

After the trial court denied Yu's motion for continuance twice, Yu requested a continuance a third time:

"[Yu]: I don't want to disrespect you, but after I've been talking to my attorney, it seems that we're not ready. I would like to ask you to extend more time for me.

"The Court: For the third time, that is denied. No. . . .

"[Yu]: I need more time to hire another attorney Your Honor.

"The Court: Well, sir, this is now untimely and I will -- this will interfere with the preparation of the evidence in this case. Give me one second [¶] . . . [¶] In *People vs. O'Malley*, O-M-A-L-L-E-Y, at 62 Cal.4th 944, the defendant there are a long line of cases regarding restrictions on the defendant's request to discharge retained counsel. It will disrupt the orderly process of justice, and we are moments away from bringing in the jury. This is untimely and it would be disruptive in order of the process of justice, and the request to discharge your present counsel is denied. Giving you time to hire another counsel, it is now too late and we are proceeding to trial. [¶] . . .

"[Yu]: Your Honor, I need more time to hire another attorney.

"The Court: Denied. All right. The jury will be in momentarily. The defendant may remain right here."

Yu contends that he is entitled to reversal because the trial court denied his request to discharge retained counsel without balancing his interest in retaining new counsel against any disruption that might flow from the substitution. This contention also lacks merit.

"The right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has long been recognized in this state [citations], and is governed by Code of Civil Procedure section 284, subdivision 2 [citations]. The right to discharge retained counsel is based on "'necessity in view both of the delicate and confidential nature of the relation between [attorney and client], and of the evil engendered by friction or distrust.'" [Citation.] . . . [¶] A nonindigent defendant's right to discharge his retained counsel, however, is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]. . . . [T]he 'fair opportunity' to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same

22

time.""" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983–984, fn. omitted.)

In this case, the trial court balanced Yu's concern that defense counsel was not yet ready to go to trial against the state's interest in proceeding to trial with a jury at the ready, and determined that the state's interest was greater. On the day of trial, Yu asked for a continuance multiple times based on his claim that defense counsel was not ready, but he gave no indication that he wished to discharge counsel until the trial court denied his request for continuance a third time. Until that point, it appears Yu intended to proceed with his current attorney, albeit with extended time for preparation. Yu did not express any other concerns regarding defense counsel, nor did he specifically state what his attorney did not know about his case, or how he would be adversely impacted if trial proceeded. Counsel had represented Yu for almost a year and a half before the trial commenced. Yu was present when counsel declared that the defense was ready for trial five days before trial, and had not contested that counsel was prepared to try the case at that time. Nothing in the record indicates that Yu had concerns about defense counsel's performance prior to the day of trial, which suggests that the request was a dilatory tactic. The trial judge, who was very familiar with defense counsel professionally, stated that he was confident that counsel was well-prepared. The record shows that the trial court discussed Yu's concerns regarding his attorney with him, and determined that they were unfounded.

23

In ruling on the motion to discharge retained counsel, the trial court cited to *People v. O'Malley* (2016) 62 Cal.4th 944, in which our Supreme Court noted that "while 'a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in deciding whether discharging counsel would result in disruption of the orderly processes of justice.' [Citation.]" (*Id.* at p. 1004.) The trial court stated that granting the motion would "interfere with the preparation of the evidence" and noted that the court was "moments away from bringing in the jury"—i.e., it determined that the state's interest in the orderly processes of justice was greater than defendant's interest in discharging counsel. The trial court's denial of Yu's motion to discharge retained counsel was not an abuse of discretion.

### *Evidence of Prior Uncharged Sexual Offenses*

In the People's trial brief, the prosecutor moved to admit evidence of prior sexual offenses under sections 1108 and 1101, subdivision (b), for purposes of proving propensity, and showing motive, intent, absence of mistake, and plan. The proffered evidence related to Yu's rape and sodomy of Laura H. in 2015, and Patrice G. in 2016.

Prior to trial, the court held a hearing on the matter. The prosecutor argued:

"There are two individual witnesses we'd like to introduce, based on [Evidence Code sections 1101, subdivision (b) and 1108]. The first one is Laura H[.] The second one is Patrice G. Laura H[.] was an individual who the defendant had seen in the street and essentially had stopped and asked whether, quote, unquote, 'you want to party?' to which she believed that that terminology meant to do drugs. The defendant then picked her up, took her to a motel, and essentially asked her for sex, and continuously asked her for sex, to the point when she declined his requests, he began to then -- proceeded to sodomize and rape her, which is extremely in line with the type of conduct that he had done to the four named victims in this case.

"Patrice G. is a prostitute who was working the streets, and this defendant had picked her up and, again, asked for her services, but she never agreed to anal sex. She only agreed to the vaginal sex, Your Honor. The defendant did not take her declination as she had indicated, and continued to sodomize her, which he did to the three of the four named victims in this case.

"We would argue, Your Honor, that it goes to propensity, and it does go to pattern of conduct by this defendant."

Defense counsel responded:

"There are multiple named victims in this case. If the people believed in good faith that they had cases against these two individuals, they would have filed charges against them. I believe this is tenuous, at best. There were

25

prostitute/client disputes in this case -- in these two cases. The people did not formally charge Mr. Yu with these two charges. They are well within the limit, if we're not talking about something so far removed that's outside that they couldn't charge it and they're trying to show a pattern of propensity. This is within the statute. They didn't have enough evidence to bring this forth for trial purposes, so now they're trying to end-run for a pattern push under 1108. I believe it's overly prejudicial. I do not believe it meets the requirements, and I would ask the court to exclude this evidence from testimony."

The trial court ruled:

"Researching the law as I have, I am familiar with *People vs. Daveggio*, D-A-V-E-G-G-I-O, and *Michaud*, at 4 Cal.5th 790.[6] *Daveggio and Michaud* held, to determine whether evidence 1108 crimes are admissible, the Court must, under 352 analysis -- Evidence Code 352 -- consider such factors as its nature, its relevance, possible remoteness, the degree of certainty, its commission, and the likelihood of confusing, misleading, or distracting the jury from its main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense or offenses, and the availability of less prejudicial alternatives to the outright admission, such as admitting some, but not all of the defendant's other sex offenses, including irrelevant

---

6 *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790.

26

inflammatory details surrounding the offense. In utilizing a 352 analysis as I am speaking, I am doing that.

"I do find that there are two incidences that are of probative value under 1108 . . . and, as such, I would allow their admission; however, it would be coming in solely under [that section], and not under 1101(b)."

The court confirmed that the jury would be fully instructed regarding the purposes for which the evidence could be considered.

At trial, Laura H. testified regarding the incident with Yu, but the prosecution did not present evidence of Yu's crimes against Patrice G.

Laura H.'s testimony was brief, occupying only 10 pages of transcript. Laura H. recounted that Yu called her over to his car while she was waiting at a bus stop and asked if she "partied." She took this to be an invitation to smoke methamphetamine. She accepted and got into the car with Yu. She explicitly told him that she did not intend to have sex with him, which he said was fine. He handed her a pipe, which she smoked in the car. Yu procured a hotel room. Laura H. accompanied him inside and they smoked methamphetamine. Laura H. left the bedroom to go to the bathroom. Yu tried to follow her, but she closed the door and locked it. When she returned, Yu was naked. Laura H. was concerned that this meant Yu wanted to have sex. She tried to leave the room, but Yu blocked the door with a chair. She told Yu that she did not want to have sex with him. Laura H. then saw a pipe with more drugs in it, so she started

smoking again.  Yu came up behind her, held her arms, and unbuttoned her pants, and placed his penis between her thighs and on her anus.  Laura H. pulled her pants up and kicked out behind her, knocking Yu onto the bed.  She grabbed $20 that was sitting on the nightstand and ran out of the room.

The money on the table belonged to Yu.  Laura H. stole it to buy alcohol.  She had a criminal record for stealing and drug use.  She was a drug addict and an alcoholic at the time of the assault.  She was not a prostitute and has never been a prostitute.  She never consented to Yu touching her.  Yu did not offer her money to go to the room with him.  Laura H. was not acquainted with any of the other victims in the case.

### **Legal Principles**

Evidence Code section 1108 provides for admission of evidence of defendant's commission of another sex offense in a prosecution for enumerated offenses, including those charged in the instant case.  (Evid. Code, § 1108, subds. (a) & (d).)  Evidence offered pursuant to Evidence Code section 1108 is subject to exclusion under Evidence Code section 352.  (*Id.* at subd. (a).)  Accordingly, evidence of other sexual offenses cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading

the jury.  (Evid. Code, § 352.)  This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 907, 916–919 (*Falsetta*); *People v. Fitch* (1997) 55 Cal.App.4th 172, 183.)

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352.  Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at pp. 916–917.)  "'[S]ection 1108 affects the practical operation of [Evidence Code] section 352 balancing[, however,] '"because admission and consideration of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible.  Hence, evidence offered under [section] 1108 could not be excluded on the basis of [section] 352 unless "the probability that its admission will . . . create

29

substantial danger of undue prejudice" . . . substantially outweighed its probative value concerning the defendant's disposition to commit the sexual offense or offenses with which he is charged and other matters relevant to the determination of the charge. . . .'" (Historical Note, 29B pt. 3, West's Ann. Evid. Code [(1998 pocket supp.)] foll. § 1108, p. 31.)' (*People v. Soto* (1998) 64 Cal.App.4th 966, 984, italics added.)" (*People v. Loy* (2011) 52 Cal.4th 46, 62.)

### Analysis

Yu contends the trial court abused its discretion under Evidence Code section 1108 by admitting evidence of his prior uncharged sexual offenses against Laura H. and Patrice G.[7]  Specifically, Yu takes issue with the trial court's ruling because "there was no information on the record by which the Court could consider the 'degree of certainty' that

---

[7] We do not discuss the trial court's ruling admitting evidence of Yu's prior sexual offenses against Patricia G. because no evidence of those crimes was presented at trial, so Yu was not prejudiced.  Although Yu states that he is challenging admission of the evidence of prior uncharged sexual offenses under Evidence Code section 1108, he does not contend that that the prior acts were not "sexual offenses" as required for admission under that section, but instead challenges the degree of certainty that he committed the acts and their inflammatory impact.  Because those issues are relevant to the trial court's Evidence Code section 352 analysis, we presume Yu's arguments pertain to admission of the evidence under that section.

[Yu] committed the 'uncharged' acts.  Nor was there anything on the record to show that '[t]he testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses.'  [Citation.]"  We find no abuse of discretion and hold the evidence was properly admitted.

Nothing about the evidence of Yu's sexual offenses against Laura H. required the trial court to exclude it.  Yu appears to challenge the certainty that the offenses were committed against Laura H. based on defense counsel's argument that the evidence was being offered as prior offense evidence because there was insufficient evidence to charge the crimes.  There is no requirement that prior acts must have been charged or prosecuted before they may be offered as evidence.  (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 353, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 466 ["'[t]he court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury"'"].)  The jury is not required to find that a prior act was committed beyond a reasonable doubt; it must find that the prior act was committed by a preponderance of the evidence.  (*People v. Avila* (2014) 59 Cal.4th 496, 516.)  Here, there was sufficient evidence for the jury to do so.  Laura H. testified, and the testimony of a single witness suffices to prove a fact by a preponderance of the evidence.  (See Evid. Code, § 411 [testimony of one witness generally sufficient to prove any fact]; *People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*)

31

[testimony of one witness sufficient to support conviction unless physically impossible or inherently improbable].)

In the trial court, Yu did not argue that anything in the nature of the prior offenses made them unduly inflammatory. The prosecution presented the crimes against Laura H. as attempted rape and sodomy. Three of the four victims in the charged offenses alleged that Yu completed the same crimes against them, which was highly probative of Yu's propensity for such acts. Moreover, Yu's prior offenses against Laura H. were attempts, not completed crimes, and thus less inflammatory than the crimes against those three victims. "[T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.) The similarity of the criminal acts and the fact that a different victim was involved also supports the trial court's finding that the evidence was more probative than prejudicial. The record establishes the trial court carefully considered the evidence, was familiar with the applicable legal principles, and made a reasoned decision. The trial court did not abuse its discretion by determining that the evidence of prior crimes against Laura H., which were committed under circumstances very similar to those of the instant crimes, was more probative than prejudicial, and therefore admissible under Evidence Code sections 1108 and 352.

### *Sufficiency of the Evidence*

Yu next contends that there was insufficient evidence to support his convictions because none of the victims presented credible testimony. We reject his arguments as impermissible attempts to persuade us to evaluate witness credibility and re-weigh the evidence, which we will not entertain on appeal. Substantial evidence supports the convictions.

When reviewing for sufficiency of the evidence, we consider "'"'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"' [Citation.] 'The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.' [Citation.] '. . . [I]t is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' [Citation.]" (*People v. Casares* (2016) 62 Cal.4th 808, 823 (*Casares*), disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Yu asserts that Mariana's testimony (counts 1-4) that he sodomized and attempted to strangle her was not credible because the SART nurse did not observe any outward signs of injury to her neck or anus, and that her lack of credibility on these points undermines the rest of her testimony. Yu cites no legal authority for the proposition that a sexual assault allegation must be supported by physical evidence of injury or expert testimony. To the contrary, the testimony of a single witness is sufficient to support conviction unless the testimony is physically impossible or inherently improbable. (*Young*, *supra*, 34 Cal.4th at p. 1181.) The law does not support Yu's assertion that we must overturn his convictions for crimes against Mariana on this basis.

Regardless, the evidence against Yu in counts 1-4 was overwhelming. In addition to Mariana's testimony, the SART nurse who conducted the exam noted that Mariana was disheveled, her makeup was running down her face, and her hair was messy. Her vagina was red and possibly bruised, and she had small, red abrasions inside her mouth and left cheek. Although there were no injuries to Mariana's anus, Mariana had reported that Yu used Vaseline when he sodomized her. In the SART nurse's opinion, the injuries were consistent with Mariana's account of events. Deputy Morse observed an empty jar of Vaseline on the nightstand in the hotel room. A DNA sample from Mariana's left breast showed Yu as a major contributor.

Yu argues that Airam (count 5) admitted she lied to the police when she told them Yu pushed her into his car. Yu

34

also suggests that Airam's failure to call for help on her cell phone brings her testimony into question. Such determinations are for the jury, which may choose to credit a witness even if it believes portions of her testimony are false.[8] (*People v. Flores* (1968) 267 Cal.App.2d 452, 457 ["'[t]he jury may reject any part of a witness' testimony and give credence to other portions'"].)

---

[8] To quote *Brandt v. Krogh* (1910) 14 Cal.App. 39, 48 (*Brandt*), upon which Yu appears to rely (Yu cites to an unpublished case, which in turn cites *Brandt*) in full: "[I]t is obviously a mistake to suppose that, because a witness may make inconsistent statements in the course of testimony given by him, such testimony is, in its entirety, to be disbelieved. The rule, '*Falsus in uno, falsus in omnibus*,' does not mean that a witness' entire testimony must necessarily be disregarded or disbelieved because there may be found falsehood in certain parts of it. The rule merely means that where the witness is found to have sworn falsely in a certain material part of his testimony, his entire testimony *may* for that reason be rejected. But no one will attempt to challenge the right of a jury or a judge, trying the facts, to believe and credit certain parts of the testimony of a witness who has been shown to have sworn falsely as to certain other material parts thereof. [Moreover], this rule is one which cannot well be invoked in a court of appeal on a review of the facts. It, like any other rule which may be resorted to by triers of facts for the purpose of weighing testimony and measuring the credibility of witnesses, is intended as a guide to those who must hear and see the witnesses and thus receive the evidence at first hand."

In this case, Airam explained that she had reported an assault to police in the past, and nothing was done about it. She was also embarrassed that she got into Yu's car willingly. She lied because she wanted to make sure the police investigated the crime. Airam testified that Yu took her cell phone when she refused to accompany him into the hotel room. She did not regain possession of it until after the attacks. Officer Cueva recovered Airam's cell phone from Yu, who admitted it belonged to a woman. In an interview with police, Yu admitted that he had picked up a woman at a bus stop, who he described as not being a prostitute, but a "working girl" with two kids, which was consistent with Airam's account and her self-description.

Yu argues that Eva's testimony (counts 6-9) that there were four locks on the hotel door and that she hit Yu in the head with a phone when trying to escape him, was undermined by the prosecution's failure to produce photographs of the door or the phone.

The defense produced no evidence to rebut either of these facts, but merely pointed to the prosecution's failure to provide photographic evidence in closing argument. There was overwhelming evidence of the attack against Eva. Eva testified that she sprayed pepper spray on Yu's eyes and penis. Police officers found Yu in a motel across the street from the church where Eva sought shelter. Officer Vasquez noticed redness on both sides of Yu's head and above his left eyebrow. Yu had an orange-colored stain on his face. Yu's shirt also had orange stains. His arm had apparent bite

marks, and the back of his head was scratched. The room looked and smelled like a lot of pepper spray had been discharged. Pepper spray stains were on the headboard and a lamp. Photographs depicted redness around Eva's neck consistent with her testimony that he attempted to strangle her. A SART nurse noted that Eva had multiple injuries, including bruising and abrasions on her anus that indicated anal penetration. DNA taken from a condom recovered in the investigation included Yu and Eva as possible contributors, which also supported her version of events.

Finally, with respect to Maritza (counts 10-12), Yu argues that Maritza's inability to identify him in a photographic six pack or in a six-man in person line-up at the county jail undermines her credibility. Other strong evidence was presented to prove Yu's identity, however. DNA from a sample on Maritza's underwear contained a mixture of DNA from Maritza and Yu. Maritza described Yu's appearance to a sketch artist who drew a sketch that Maritza recognized the as depicting her attacker. Maritza sent a booking photograph of Yu to Detective Jara, identifying him as her assailant. She also identified Yu at the preliminary hearing, and at trial.

The People presented substantial evidence to establish Yu's guilt. The jury had all of the information it needed to determine the effect of any inconsistencies on the victims' credibility as witnesses. We will not second-guess its findings. (See *Casares*, *supra*, 62 Cal.4th at p. 823 ["'it is the

jury rather than the reviewing court that weighs the evidence'"].)

## DISPOSITION

We affirm the trial court's judgment.


MOOR, J.

We concur:



RUBIN, P. J.



BAKER, J.